# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDWARD RHODES,
      Plaintiff,

          v.

SUPERIOR COURT OF THE DISTRICT
OF COLUMBIA, et al.,
      Defendants.

Civil Action No. 17-0698 (JDB)

## MEMORANDUM OPINION

Plaintiff Edward Rhodes, a former employee of the District of Columbia Courts ("D.C. Courts"), brought this action under the Americans with Disabilities Act ("ADA"). See 42 U.S.C. § 12101. The District of Columbia ("defendant") has filed a motion for summary judgment.[1] For the reasons discussed below, the Court grants defendant's motion.

## BACKGROUND

From March 2002 through September 2016, Rhodes was an employee of the Superior Court of the District of Columbia. See generally Def. Dist. of Colum.'s Mem. of P. & A. in Supp. of its Mot. for Summ. J. ("Def.'s Mem.") [ECF No. 36], Ex. 1 ("Notifications of Personnel Actions") [ECF No. 36-3].[2] Michael Francis ("Francis"), the Community Court Coordinator for the Criminal Division of the Superior Court, became Rhodes's direct supervisor on January 4, 2006. Def.'s Mem., Ex. 2 ("Francis Decl.") [ECF No. 36-4] ¶¶ 1–2; see id., Ex. 5 ( "Rhodes Dep.") [ECF No. 36-7] at 35:15–18.

---

[1] The Court's October 4, 2018 Order, ECF No. 27, dismissed all claims against Michael Francis, Daniel Cipullo, and the Superior Court of the District of Columbia and substituted the District of Columbia as the proper defendant. The caption of the case remained unchanged.

[2] Rhodes resigned from his position in January 2007 and returned to Superior Court in September 2007 as a Deputy Clerk I in the Criminal Division. See Def.'s Mem., Ex. 1 at 2–3.

"In January 2012, the Community Court Office assumed responsibility for assigning community service to criminal defendants involved in diversion programs." Francis Decl. ¶ 3. Francis assigned Rhodes the task of "enter[ing] data pertaining to community service placements in CourtView, the Superior Court's docket management database." Id.; see Rhodes Dep. at 20:10–15, 41:4–14; Def.'s Mem., Ex. 8 [ECF No. 36-10] at 3 ("I assigned defendants to [community service] sites by typing in the names of the persons performing services, the community service sites, and . . . duties at that site. I verified their work performance and recorded their hours manually and updated the system.").

## A. ACCOMMODATIONS

Rhodes is nearsighted, Rhodes Dep. at 8:22–9:15, and "it was common knowledge all over the department and the court that [he has] vision problems," id. at 45:12–14. The parties do not dispute that Rhodes's supervisors were aware of, and the D.C. Courts provided accommodations for, his nearsightedness. For example, Rhodes states that a former supervisor provided him a magnifying glass and a larger (19-inch) computer monitor in or about 2004, see id. at 31:15–32:15, 42:7–44:11, and defendant "provided Mr. Rhodes with accommodations for several separate trainings since 2006" by "reserving the best seat for him to be able to see the presenter and the screen, while also arranging for a laptop computer so that he would have his own personal screen to see the presentation," Def.'s Mem., Ex. 3 ("Grandy Decl.") [ECF No. 36-5] ¶ 11.

When Rhodes was required to do more work on CourtView "in 2011, 2012 when the community court expanded," Rhodes Dep. at 20:10–11, he had trouble reading the computer screen, see id. at 17:2–3, 20:14–19, 41:11–14. Rhodes did not initiate a request for an accommodation for his nearsightedness; his supervisors referred him to H. Clifton Grandy ("Grandy"), the ADA Coordinator for the District of Columbia Courts. Grandy Decl. ¶¶ 1–2;

Rhodes Dep. at 44:22–46:11, 47:16–18. The first of Grandy's many meetings with Rhodes occurred on January 20, 2012. Grandy Decl. ¶ 5. At that meeting, Rhodes "disclosed that his disability is extreme nearsightedness and that he is 'legally blind[.]'" Grandy Decl., Ex. 1 (Summary Regarding Reasonable Accommodations Provided Edward Lennon Rhodes) at 2 (page numbers designated by defendant). Grandy "considered Mr. Rhodes as a person with disabilities who is covered by the [ADA.]" Id., Ex. 1 at 2. Although Grandy "did not request medical documentation," Rhodes nonetheless supplied "a medical report from Dr. Ronald L. Anderson dated March 5, 2013[.]" Id. ¶ 13; see id., Ex. 1 at 3. This medical report, a copy of an eyeglass prescription, see Def.'s Mem., Ex. 10, "did not discuss reasonable accommodations" for Rhodes's nearsightedness, Grandy Decl. ¶ 13.

Grandy met with Rhodes "[o]n several occasions . . . to discuss whether his accommodations continued to be effective and to notify him about additional resources and events available to nearsighted persons." Grandy Decl. ¶ 12. He kept records of his "interactions and communications with . . . Rhodes and others about his requests for accommodations and [defendant's] responses to his requests, . . . [and] prepared a chronological summary of some of the accommodations . . . provided to [him] for his nearsightedness." Id. ¶ 3. This summary also documented Grandy's efforts to inquire "whether the accommodations [Rhodes] received were adequate, and whether he needed additional accommodations." Id. ¶ 4. Rhodes had an opportunity to review Grandy's summary, and testified at his deposition that he "didn't see anything that Mr. Grandy wrote that wasn't true[.]" Rhodes Dep. at 114:10–11.

Between February 2012 and September 2013, the D.C. Courts provided Rhodes the following adaptive technologies:

- Microsoft Comfort Optical Mouse 3000 to magnify the image displayed on the computer monitor

- Keys U See, an oversized keyboard with high contrast yellow keys and large black print letters
- A 27-inch computer monitor
- Ruby handheld digital video magnifier
- All Spectrum desk lamp

Def. Dist. of Colum.'s Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. ("SMF") [ECF No. 36-1] ¶¶ 7–10; Grandy Decl. ¶¶ 6–9; see id., Ex. 1 at 2–4; Rhodes Dep. at 52:11–53:9, 59:10–12, 57:15–58:22.[3]  "The D.C. Courts also provided [him], at [Grandy's] request, technical assistance with adjusting the monitor display settings so that he would have enlarged fonts and icons on his computer monitor."  Grandy Decl. ¶ 10; see also SMF ¶ 11; Rhodes Dep. at 59:4–60:2.  In addition, the D.C. Courts provided "technical assistance by monitoring him as he worked to ensure that errors in his work were not being introduced in [the CourtView] software."  Grandy Decl. ¶ 10.

Grandy suggested that Rhodes speak with Louis Jenkins ("Jenkins"), another court employee "who had low vision" and "had received a reasonable accommodation with which he was pleased."  Id., Ex. 1 at 2; see also Rhodes Dep. at 48:4–7; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl's Opp'n") [ECF No. 40] at 2 (page numbers designated by ECF).  Jenkins agreed "to demonstrate his accommodations to other employees," Grandy Decl., Ex. 1 at 2, and he met with Rhodes at Grandy's request, see Rhodes Dep. at 48:7–10, 50:15–22.  Jenkins showed Rhodes "the things that he had . . . requested, and . . . received," id. at 48:8–10.  Among Jenkins's accommodations was a 36-inch computer monitor, and according to Rhodes, Jenkins suggested that he too request one.  Id. at 48:10–18, 50:14–51:10.  Rhodes claimed that, if he had a 36-inch monitor, he could have enlarged fonts while still keeping the entire program window visible on his monitor.  Id. at 55:2–6.

---

[3]  Rhodes elsewhere has stated that he received the 27-inch computer monitor, keyboard, and Ruby handheld magnifier in 2011.  See Rhodes Dep. at 57:15–59:12.

The date on which Rhodes requested a 36-inch monitor is unclear. SMF ¶ 40. He could have made his request in February 2009, see Def.'s Mem., Ex. 8 at 1–2, or "around 2011," Rhodes Dep. at 51:22–53:6, long before he met with Grandy or Jenkins.

Rhodes considered the 27-inch screen an improvement over the 19-inch screen he had before, id. at 54:8–12, 55:7–11, "but it didn't totally solve the problem," id. at 54:10–11. "[W]hen the fonts are enlarged enough for him to see them, the text would not fit on the screen properly." Pl.'s Opp'n at 3. When the D.C. Courts upgraded all employees' computers with 27-inch screens in 2015, Rhodes Dep. at 62:15–20, Rhodes asked that his 27-inch monitor be reconfigured as his previous monitor had been, in such a way "that it would magnify things a lot more," id. at 59:17–18, but no one "came out and reconfigured [his] computer," id. at 63:13–14.

In August 2015, "[m]anagement met with HR, the ADA coordinator, and Assistant General Counsel . . . and confirmed that [in their view] Mr. Rhodes had received all the necessary accommodations." Def.'s Mem., Ex. 4 ("Cipullo Decl.") [ECF No. 36-6] Ex. 1 (Mem. from Dan Cipullo to James McGinley dated August 24, 2016) at 2.

## B. PERFORMANCE EVALUATIONS

Rhodes's performance evaluations were based on four elements: (1) Case Management; (2) Data Entry and Document Creation; (3) Special Projects and Assignments; and (4) Community Engagement and Reports on Community. SMF ¶ 5. Ratings on the first two elements "accounted for 70-80% of his overall performance ratings between 2011 and 2016." Id.

### 1. July 1, 2011, through June 30, 2012

For the period ending June 2012, Francis rated Rhodes's performance "Commendable" with an overall performance score of 3.0 out of a possible 5.0.[4]  Francis Decl. ¶ 4; see id., Ex. 1 (2011-2012 Performance Evaluation) at 1, 7.  Francis noted that Rhodes "sometimes misse[d] deadlines and sometimes his work [was] not complete or in error."  Id., Ex. 1 at 6.  In one case, Rhodes submitted "a totally unprofessional and 'sloppy' Community Service Program-Host Site Contact Form," and Francis commented that Rhodes did "not review his work adequately."  Id., Ex. 1 at 6.

### 2.  January 2013 Midyear Evaluation

By January 2013, Rhodes's rating fell to "Needs Improvement" with an overall performance score of 2.85 out of a possible 5.0.  Id. ¶ 5.  These results prompted Francis to place him on an Employee Improvement Plan ("EIP") from February 2013 through May 2013.  Id. ¶ 6.  Between February 2013 and June 2013, Rhodes "received 41 hours of individualized training from Sonya Miranda, the trainer for the Community Support Branch."  Id. ¶ 7; see id., Ex. 4 (Training Assessment dated June 20, 2013).  According to Miranda, training progressed very slowly for two main reasons: Rhodes "typed extremely slow[ly]," and he "took leave during the scheduled training sessions," id., Ex. 4, Bates No. 38.  She concluded that he needed more training, including "the basics of how to maneuver through the screens and functions of CourtView as it relate[d] to his position" and "repetition on the basics of where screens and hyperlinks are located in CourtView."  Id., Ex. 4, Bates No. 39.  Further, Miranda opined that Rhodes "could use additional practice sessions allowing him to work from [the] Community Court checklist . . . created in

---

[4]  Rhodes's evaluation only covered performance for the period from July 1, 2011 through March 3, 2012. After having sustained a serious injury on March 4, 2012, he did not return to work full time until August 2, 2012, after the review period ended.  See Francis Decl., Ex. 1 at 8.

training, which would allow him to become more comfortable with the Community Court process." Id., Ex. 4, Bates No. 40. The "EIP was . . . rescinded because [Rhodes] was out of the office on sick leave for a significant portion of the 90-day period." Id. ¶ 7.

### 3. July 1, 2012, to June 30, 2013

For the review period ending in June 2013, Francis gave Rhodes a "Needs Improvement" rating with an overall performance score of 2.79. Id. ¶ 8; see id., Ex. 2 (2012-2013 Performance Evaluation) at 1, 6. Francis noted that Rhodes made errors in CourtView entries, such as entering incorrect case numbers, entry dates, and due dates; not entering telephone numbers; and making docket entries out of sequence. Id., Ex. 2 at 3. In light of Rhodes's "need[] to improve his use of [CourtView]," Francis recommended that Rhodes "[g]et . . . a larger and special computer monitor [and a]dditional CourtView training." Id., Ex. 2 at 8.

### 4. July 1, 2013, to June 30, 2014

Rhodes's training sessions with Miranda resumed in August 2013 and ended in March 2014. Id. ¶ 10; see generally id., Ex. 4 (Training Evaluation Report dated April 7, 2014). The sessions included review of the Community Court Office Standard Operating Procedures. Id., Ex. 4 at 4–5. Initially "a significant amount of training time was consumed reviewing different [CourtView] screens and navigating through hyperlinks," moving later to "skills and drills . . . navigating from the docket entries hyperlinks to party maintenance" and other topics. Id., Ex. 4 at 8. Rhodes ended this training with a "checklist" and "an action plan to guide him in applying [his training] to prevent errors and discrepancies in his work product." Id., Ex. 4 at 7. Even though he "received the tools and the necessary training to perform the normal everyday functions of his position," id., he still typed "extremely slow[ly] and ha[d] limited computer skills," id., Ex. 4 at 9. Miranda observed Rhodes "updating docket entries, updating diversion condition maintenance

screens but neglect[ing] to hit save, therefore not realizing that the information was not being retained in [CourtView]." Id. In addition to a basic computer course, Miranda recommended "more supervisory one on one monitoring and observation of his work to see why certain errors are made." Id.

Rhodes's performance improved during this reporting period, and he achieved a "Commendable" rating with an overall performance score of 3.0. Id. ¶ 9; see id., Ex. 3 (2013-2014 Performance Evaluation) at 1, 7. As Miranda recommended, he "participated in a CET sponsored 'Microsoft Word 2007: Introduction' training and enrolled in a Workforce Development Program at the UDC Community College . . . to enhance his computer skills and Language Arts (writing skills)". Id., Ex. 3 at 8. In addition, "[e]very day in the late afternoon, [Rhodes's] work in CourtView for the day [was] reviewed by his supervisor and [Rhodes was] provided feedback." Id.

### 5. July 1, 2014, to June 30, 2015

Francis assessed Rhodes a "Needs Improvement" rating with an overall performance score of 2.91 for the period ending June 2015. Id. ¶ 11.

### 6. December 2015 Midyear Evaluation

For the period from July 1, 2015 through December 18, 2015, Rhodes received a "Needs Improvement" rating and an overall performance score of 2.31. Id. ¶ 12; see id., Ex. 5 (2015 Mid-Year Evaluation) at 7. With respect to the Data Entry and Document Creation element, Francis noted that Rhodes's "performance [was] really below expectations" because, for example, his CourtView entries had incorrect entry and due dates, listed incorrect email addresses, and scanned the incorrect forms, and on at least one occasion, Rhodes did not process a case at all. Id., Ex. 5 at 3. Francis found that Rhodes did not meet expectations consistently with respect to the

Communication, Customer Service, and Dependability aspects of his position, and that he could not "be counted on to (1) provide accurate and error free contact forms and (2) enter the correct information into CourtView." Id., Ex. 5 at 6.

### 7. January 4, 2016, to April 4, 2016

Following Rhodes's December 2015 midyear evaluation, Francis placed him on a second EIP from January 4, 2016, through April 4, 2016. Id. ¶ 13; see generally id., Ex. 6 (2016 EIP Evaluation). Francis "met with [him] almost daily to review his work and to give him feedback on his large number of mistakes." Id. ¶ 14. In addition, Francis observed Rhodes "in the Community Service Program Office . . . assign defendants to community service and process community service cases in CourtView." Id., Ex. 7 (Memorandum from Michael O. Francis to Dan Cipullo dated May 4, 2016) at 3. He reviewed Rhodes's work daily, id., and "notified him in writing of any errors . . . which included CourtView screen shots and images of the contact forms[ so that Rhodes] saw the details of his errors," id., Ex. 6 at 8.

Rhodes does not dispute that he received extensive training and daily feedback from Francis during the EIP period. See Rhodes Dep. at 127:21–128:10. "At no point during these daily meetings did [he] say that his [ADA] accommodations were ineffective or request additional accommodations." Francis Decl. ¶ 15. Rather, Rhodes attributed his errors to entries and corrections "clearly . . . not being saved" in CourtView, see Rhodes Dep. at 128:12–19; see Pl.'s Opp'n at 2, or to "the computer not operating correctly," Pl.'s Opp'n at 4.

Rhodes's "performance rating actually decreased during the EIP period," during which he also "demonstrated additional performance areas of concern[,] namely the job element for Special Projects and Assignments and in the Core Competencies of Adaptability, Integrity, Initiative, and

Job Knowledge." Francis Decl., Ex. 7 at 3. Francis rated Rhodes's performance "Unsatisfactory" with an overall performance score of 1.91. Id., Ex. 6 at 1, 7.

### 8. July 1, 2015, to June 30, 2016

Rhodes's performance was also rated "Unsatisfactory" with an overall performance score of 1.91 for the evaluation period ending June 2016. Id. ¶ 17; see id., Ex. 9 (2015-2016 Performance Evaluation) [ECF No. 36-11] at 7. Francis rated his performance on the Case Management element as "Needs Improvement" because "[o]nly 87% of the contact forms [Rhodes prepared] were without any error," and an incumbent who met expectations would have processed 97% of cases accurately. Id., Ex. 9 at 2. Rhodes's "errors included entering incorrectly on the contact forms the following: community service completion date, next court date, email address of the defendant, case number, interview date, number of community service hours to be completed by the defendant, and the spelling of the name of the defendant." Id. Francis rated Rhodes's performance "Unsatisfactory" on the Data Entry and Document Creation element as well, noting that "[o]nly 69% of the cases that he processed and entered information into CourtView were without any error which is well below the 97% required to meet expectations[.]" Id., Ex. 9 at 3.

Francis compared Rhodes's "performance from 2015 to 2016 on three elements of his position" to his coworkers' performance, id. ¶ 16, and found that the percentage of error-free entries Rhodes made was well below that of his coworkers, see generally id., Ex. 8 (Comparison of the 2015-2016 Performance Evaluations of Employees in the Community Court Branch, Criminal Division).

### C. TERMINATION

By memorandum dated May 4, 2016, Francis recommended to Dan Cipullo, Director of the Criminal Division, that Rhodes's employment be terminated. Id. ¶ 18; see generally id., Ex.

7.  Francis cited several examples of errors Rhodes had made and described the training, coaching, and monitoring Rhodes had received.  See id., Ex. 7 at 2–3.  He also noted Rhodes's "negative attitude and problematic behaviors . . . when responding to concerns [Francis] present[ed] about his work performance and mistakes."  Id., Ex. 7 at 1.  Francis concluded:

> [G]iven Mr. Rhodes'[s] inability to improve his work performance to meet expectations (even with coaching, monitoring and advising)[,] another 90-day EIP period is unlikely to lead to him meeting expectations.  His performance deficiencies regarding the contact forms reflect poorly on the Community Service Program (CSP), the Community Court Office, the Criminal Division, and DC Superior Court.  Data entered into the Court[']s official system of record is used to make critical judicial decisions.  Customers must be able to trust and depend on the Courts for information that is both accurate and reliable.  The numbers and types of errors found in Rhodes'[s] work compromises the integrity and credibility of the data.  Other CSP staffs are also affected by these deficiencies.  Staffs who e-mail the contact forms to all the germane community service host sites must depend on the accuracy and reliability of the data entered on the forms.  Sending out contact forms with errors is unacceptable.  Doing so erodes the trust levels of the public in the information received from the Courts.  When community service cases are not processed correctly in CourtView, CSP staffs and [Francis] cannot check on or look up cases when necessary.  The amount of time and attention expended to monitor, correct, and respond to Mr. Rhodes'[s] unsatisfactory work is extremely time consuming and inordinate given the performance expectations of someone at his grade level.  For these reasons and information presented within the supporting documentation, [Francis] believe[d] termination [was] warranted.

Id., Ex. 7 at 3–4.  On May 12, 2016, Francis gave Rhodes "a notice of proposed termination along with a folder several inches thick of documentation . . . Francis [had given him] each day when they reviewed his work during the period of the EIP."  Cipullo Decl. ¶ 4.

Rhodes's response to the notice of proposed termination focused on his request for a 36-inch computer monitor "because of [his] low vision," his receipt of a 27-inch monitor instead, and IT's failure to adjust his computer "so that [he] was able to complete [his] [a]ssignments."  Def.'s

Mem., Ex. 6 (Letter from plaintiff to Dan W. Cipullo dated May 24, 2016). He had "told [Francis] a[t] least 50 times that [his] computer [was] not working properly, but to no avail." Id., Ex. 6; see Rhodes Dep. at 128:12–17. Rhodes submitted a second response to the notice of termination on June 9, 2016, asserting "that the [proposed] action is in violation of the [ADA] because he was not given what he felt was the reasonable accommodation of a larger computer screen." Cipullo Decl., Ex. 1 at 3. Notwithstanding these representations, Rhodes testified at his deposition that he was able to complete his assignments using a 27-inch monitor. Rhodes Dep. at 131:7–10.

Cipullo acknowledged Rhodes's assertion that his computer with its 27-inch monitor "was not working properly because his work was not being saved." Cipullo Decl., Ex. 1 at 3. Cipullo explained:

> It is true that Mr. Rhodes complained multiple times that his computer was not working. Both Mr. Francis and IT staff responded to [his] complaints and both observed him and saw him successfully save his work. It became clear to Mr. Francis and IT that there was no problem with the computer. It was clear that sometimes [his] work was not being saved because Mr. Rhodes was forgetting to hit the save button once he made his data entries (as Ms. Miranda had noted in her 2014 training summary). No other employee in the Court, using the same database, has experienced problems saving data.

Id. Cipullo noted the extensive training and adaptive technology Rhodes had been provided and Rhodes's ability "to complete his work accurately in excess of 80% of the time," even if this percentage failed to meet expectations for his position, using the 27-inch monitor. Id. He found that Rhodes "knew how to do his job but that he was not able to consistently follow the [standard operating procedures]" and that he refused to use the checklist Miranda developed which "would have helped him to make sure he was following" the proper procedures. Id., Ex. 1 at 4. After having reviewed Francis's May 4, 2016 memorandum, Rhodes's performance evaluations from 2012 through 2016, and Miranda's training report, id. ¶ 5, Cipullo recommended to James D.

McGinley ("McGinley"), the Clerk of Court, that Rhodes's employment be terminated, id., Ex. 1 at 4.

McGinley concurred with Cipullo's recommendation. See generally Def.'s Mem., Ex. 7 (Memorandum from James D. McGinley to Dan Cipullo dated August 25, 2016) [ECF No. 36-9]. Notwithstanding "the extensive training and performance management efforts undertaken by the Criminal Division" from 2012 to 2016 to coach him, Rhodes did "not display competency at the essential functions of his position; namely, attention to detail and accuracy in data processing." Id., Ex. 7 at 1–2. Rhodes's termination was effective on September 2, 2016. See Def.'s Mem., Ex. 1 at 1 (Notification of Personnel Action dated September 13, 2016); SMF ¶ 39.

## LEGAL STANDARD

The Court grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict in the non-moving party's favor. Scott v. Harris, 550 U.S. 372, 380 (2007). The moving party bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. See Fed. R. Civ. P. 56(c)(1); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party then must point to specific facts in the record that reveal a genuine issue that is suitable for trial. See Celotex, 477 U.S. at 324.

In considering a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-

movant.  See Anderson, 477 U.S. at 255.  Conclusory statements without evidentiary support do not establish a genuine issue for trial.  See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  "If the evidence is merely colorable . . . or is not significantly probative . . . , summary judgment may be granted."  Anderson, 477 U.S. at 249–50 (citations omitted).  Further, "the non-moving party cannot rely upon inadmissible evidence to survive summary judgment; rather, [he] must rely on evidence that would arguably be admissible at trial."  Manuel v. Potter, 685 F. Supp. 2d 46, 58 (D.D.C. 2010) (citation omitted).

## ANALYSIS

### A.  DISABILITY DISCRIMINATION CLAIM

It is "unlawful for an employer to discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (quoting 42 U.S.C. § 12112(a)) (internal quotation marks omitted).  "Putting aside the issue of reasonable accommodation, the two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's disability."  Id.  Here, termination is undisputedly an adverse employment action, cf., Hodges v. District of Columbia, 172 F. Supp. 3d 271, 280 (D.D.C. 2016) ("[I]t is undisputed that Plaintiff's termination constituted an adverse employment action."), but Rhodes must demonstrate that such an adverse action arose "because of [his] disability," Adeyemi, 525 F.3d at 1226 (emphasis added).

Rhodes provides little factual basis to evaluate whether he has a "disability" as defined under the ADA, but he does appear to qualify narrowly.  "'Disability' is [a] term of art under the

statute that carries a specific meaning." Adams v. Rice, 531 F.3d 936, 943 (D.C. Cir. 2017). To demonstrate a "disability" under the ADA, a plaintiff must show at least one of the following:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1). "Major life activities" include seeing, reading, and working. Id. § 12102(2)(A). "The term 'substantially limits' is construed broadly" and "is not meant to be a demanding standard." 42 C.F.R. § 1630.2(j)(1)(i). A plaintiff qualifies as "'being regarded as having such an impairment' if the [plaintiff] establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Rhodes bears the burden of proving his disability, see Haynes v. Williams, 392 F.3d 478, 482 (D.C. Cir. 2004), and he is not relieved of his burden just because his employer provided him with accommodations, see Thompson v. Rice, 422 F. Supp. 2d 158, 170 (D.D.C. 2006), aff'd, 305 F. App'x 665 (D.C. Cir. 2008). "[A] plaintiff is disabled under the ADA if: (1) he suffers from an impairment; (2) the impairment limits an activity that constitutes a major life activity under the Act; and (3) the limitation is substantial." Haynes, 392 F.3d at 481–82.

Rhodes offers minimal evidence that he has a "disability" as defined under the statute, but this evidence is enough to place the issue in genuine dispute. Scott, 550 U.S. at 380. He produces a "report from [his] ophthalmologist, Dr. [Ronald] Anderson, explaining [his] visual impairment." Def.'s Mem., Ex. 8 at 2. In substance, this "report" was a prescription for eyeglasses dated March 5, 2013. Id., Ex. 10 ("Prescription") [ECF No. 39] at 1. Although such evidence is sufficient to demonstrate an impairment that limits major life activities (at minimum, seeing, reading, and

working), it is more difficult to determine whether the limitation was substantial. See <u>Haynes</u>, 392 F.3d at 481–82. The prescription neither describes Rhodes's condition nor recommends accommodations to address it. See Prescription at 1; see also <u>Thompson</u>, 422 F. Supp. 2d 170 ("Merely submitting a medical diagnosis of an impairment is insufficient to establish disability status."). Still, his prescription is severe, see Prescription at 1, and his deposition testimony speaks to significant limitations based on his nearsightedness, including inability to read small print without either placing the text about an inch away from his face or using a magnifying glass, see Rhodes Dep. 9:5–16:14. "Whatever the comparative credibility of medical versus personal testimony, a plaintiff's personal testimony cannot be inadequate to raise a genuine issue regarding his 'own experience.'" <u>Haynes</u>, 392 F.3d at 482. Given the broad construal of "substantially limits," 42 C.F.R. § 1630.2(j)(1)(i), Rhodes likely qualifies as disabled under 42 U.S.C. § 12102(1)(A).

The record also suggests that Rhodes's colleagues recognized that he "ha[d] difficulty seeing the computer keyboard and screen." Cipullo Decl, Ex. 1 at 1. Rhodes testified that "it was common knowledge all over the department and the court that [he] had vision problems," and he stated that his supervisor referred him to the ADA Coordinator for the D.C. Courts. Rhodes Dep. 45:8–46:11. In an exhibit to his declaration, the ADA Coordinator noted that he "considered Mr. Rhodes as a person with disabilities who is covered by the [ADA.]" Grandy Decl., Ex. 1 at 2. Rhodes offers little of his own evidence showing that his employer thought that his visual impairments "substantially limit[ed]" his ability to perform his major life activities, 42 U.S.C. § 12102(1)(A), but again, analyzing the facts in the light most favorable to the non-movant, his impairment appears to qualify as a "disability" under the statute, see <u>Anderson</u>, 477 U.S. at 255.

Even if Rhodes does have a "disability" under the ADA, he has failed to show that the D.C. Courts terminated his employment <u>because</u> of that "disability." Where the plaintiff lacks direct evidence of discrimination, as in this case, the court evaluates ADA claims under the familiar burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Giles v. Transit Emps. Fed. Credit Union</u>, 794 F.3d 1, 5 (D.C. Cir. 2015). Assuming that Rhodes has made out a prima facie case of discrimination, defendant nevertheless puts forth "a legitimate, non-discriminatory" rationale for terminating Rhodes's employment. <u>Id.</u> at 6. Despite specialized training and adaptive technology, Rhodes did not meet the expectations of his position, particularly with respect to entering accurate information into CourtView. <u>See</u> Francis Decl. ¶ 18. His evaluations reflect a decline in performance ratings from "Commendable" to "Needs Improvement" to "Unsatisfactory" over a five-year period with commensurate decreases in overall performance scores from 3.0 to 1.91 (out of a possible score of 5.0). <u>Id.</u> ¶¶ 4–17. Notably, his performance declined during the second EIP period notwithstanding daily review of his work and continuing feedback from Francis. <u>Id.</u> ¶ 17.

Rhodes's work assignment required that he enter data regarding criminal defendants' community service placements in CourtView, and defendant demonstrates that Rhodes did not perform at the requisite level of accuracy. His error rate was significantly worse than that of his coworkers, <u>id.</u>, Ex. 8 at 1–2; <u>see also</u> <u>id.</u> ¶ 16, and "[t]he numbers and types of errors found in [his] work compromise[d] the integrity and credibility of the data" in CourtView on which "critical judicial decisions" were made, <u>id.</u>, Ex. 7 at 3. The amount of monitoring and correcting of Rhodes's work was "inordinate given the performance expectations of someone at his grade level." <u>Id.</u>, Ex. 7 at 4.

Defendant has demonstrated that the D.C. Courts addressed Rhodes's concern that his computer was not working and his assertion that his work was not being saved. Moreover, the D.C. Courts addressed his need for additional training on CourtView, basic computer skills, and typing. And through Francis's declaration, defendant has shown that Rhodes neither asked for any additional accommodation for his nearsightedness nor indicated that the accommodations he had been provided were ineffective. See Francis Decl. ¶ 15. In short, defendant articulates a credible nondiscriminatory reason for its decision to terminate Rhodes's employment. See Figueroa v. Pompeo, 923 F.3d 1078, 1088 (D.C. Cir. 2019) ("[T]he nondiscriminatory explanation must be legitimate. In other words, the reason must be facially 'credible' in light of the proffered evidence.").

"[T]he ADA does not prohibit an employer from terminating an employee who cannot perform the essential functions of [his] position, albeit with a reasonable accommodation." McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 4 (D.C. Cir. 2010). Defendant puts forth evidence—which Rhodes fails to rebut—from which a jury could conclude (1) that Rhodes's performance fell below the standards for his Deputy Clerk position; (2) that adaptive technology, close supervision and one-on-one training did not result in sustained improvement in performance; and (3) that Rhodes's errors compromised the integrity of data in CourtView on which judges, defendants, and the public rely. Based on that evidence, a jury reasonably could find that the D.C. Courts' decision to terminate Rhodes's employment was legitimate and free of a discriminatory motive. See Varnado v. Save the Children, No. 18-CV-0752, 2019 WL 2184821, at *4 (D.D.C. May 21, 2019) (applying Figueroa to find that employer "has proffered admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions"), appeal docketed, No. 19-7063 (D.C. Cir. June 25, 2019).

In the face of defendant's showing, Rhodes can prevail only if he "produce[s] evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against [him] based on his disability." Adeyemi, 525 F.3d at 1227); see also Giles, 794 F.3d at 6 ("[T]he only remaining question is whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." (internal quotation marks omitted)). A plaintiff might demonstrate that his former employer's reason was pretextual by "offer[ing] many types of evidence, including 'the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.'" Varnado, No. 18-CV-0752, 2019 WL 2184821, at *4 (quoting Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015)).

Rhodes provides almost no evidence to show that defendant's stated reasons for terminating his employment were pretext for discrimination because of a disability. He refers to his eyeglass prescription, Pl.'s Opp'n at 1, yet even if the prescription—when combined with his testimony—can establish his disability, it provides no evidence of pretext. He also emphasizes that a different employee, who also suffered from vision problems, "requested a bigger monitor and received it." Id. at 5. But even assuming different treatment between the two employees, that comparison does not demonstrate bias against individuals with visual impairments; indeed, the provision of an additional accommodation to the other employee suggests that visual impairment was not a basis for adverse employment actions in the D.C. Courts.

Because Rhodes has not put forward sufficient evidence for a reasonable jury to find that defendant's legitimate, nondiscriminatory reason was not the actual motivation for Rhodes's termination, summary judgment must be granted for defendant on the ADA discrimination claim.

## B. FAILURE-TO-ACCOMMODATE CLAIM

An employer runs afoul of the ADA by "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee."  42 U.S.C. § 12112(b)(5)(A).  To succeed on a failure-to-accommodate claim, a plaintiff must demonstrate "(1) that he . . . has a disability under the ADA; (2) that the employer had notice of the disability; (3) that the plaintiff could perform the essential functions of the position either with reasonable accommodation or without it; and (4) that the employer refused to make the accommodation."  Hill v. Assocs. for Renewal in Educ., Inc., 897 F.3d 232, 237 (D.C. Cir. 2018), cert. denied, 139 S. Ct. 1201 (2019).

Rhodes's failure-to-accommodate claim must fail because he cites no evidence in the record showing that he could have performed the functions of his Deputy Clerk position, even with reasonable accommodations for his nearsightedness, at the time the D.C. Courts purportedly denied the accommodation.  See Minter v. District of Columbia, 809 F.3d 66, 70 (D.C. Cir. 2015).  CourtView entries comprise a significant portion of Rhodes's job responsibilities, and his performance—particularly on the Case Management and Data Entry and Document Creation elements—declined from 2011 to 2016 to levels well below the requisite accuracy.  Moreover, the D.C. Courts addressed Rhodes's concerns that his computer was not working properly and was not saving CourtView entries, concluding that his work was not saved because Rhodes did not hit the save button.  The record reflects that the D.C. Courts' ADA Coordinator met and communicated with Rhodes on several occasions to address his nearsightedness and that the D.C.

Courts provided him with adaptive technologies, one-on-one CourtView training, training to bolster his typing and computer skills, and technical assistance which allowed for adjustments of the display settings on the computer monitor. Notwithstanding these efforts, Rhodes managed to attain only an "Unsatisfactory" or "Needs Improvement" rating for the period immediately preceding his termination.

Rhodes maintains that the D.C. Courts should have provided him a 36-inch computer monitor as an accommodation. But he does not show that such a monitor would have been a reasonable accommodation for his nearsightedness. "To determine an appropriate reasonable accommodation, the agency should 'initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation.'" Pauling v. District of Columbia, 286 F. Supp. 3d 179, 211 (D.D.C. 2017) (quoting 29 C.F.R. § 1630.2(o)(3)). An employee can establish that his request for accommodation was denied by showing that his employer either ended the interactive process or participated in the interactive process in bad faith. See Ward v. McDonald, 762 F.3d 24, 32 (D.C. Cir. 2014).

The parties agree that the D.C. Courts provided Rhodes with a magnifier mouse, Keys U See keyboard, Ruby digital magnifier, all-spectrum desk lamp, and a 27-inch computer monitor, plus technical assistance for their use. Thus, there is no genuine issue of material fact with respect to the D.C. Courts' participation in the interactive process. "An employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation." Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1305 (D.C. Cir. 1998) (quoting Gile v. United Airlines, 95 F.3d 492, 499 (7th Cir. 1996)). Here, the employer provided a 27-inch monitor and other accommodations, and the record evidence confirms that a 27-inch monitor was sufficient to enable him to perform his responsibilities. A 36-inch monitor was not

the only "reasonable accommodation" to Rhodes's needs, and his failure-to-accommodate claim must fail because defendant provided ample other resources to address his disability.[5]  In the end, as noted above, it was not the provision of a 27-inch monitor, rather than a 36-inch monitor, that prevented Rhodes from performing the essential functions of his position.

## CONCLUSION

Defendant District of Columbia demonstrates that there are no disputed issues of material fact and that it is entitled to judgment as a matter of law on plaintiff Rhodes's ADA claims. Accordingly, the Court grants defendant's summary judgment motion.  An Order is issued separately.


DATE:  December 18, 2019                           _____/s/_____

                                                                          JOHN D. BATES
                                                                    United States District Judge

---

[5] In his Opposition, Rhodes raises a new argument, claiming that he was denied schedule adjustments "so that he could enroll in class at the community college of the District of Columbia to improve his typing and writing skills."  Pl.'s Opp'n at 4.  Rhodes raises this issue too late in the day, however, for "a plaintiff—even a pro so plaintiff—may not amend the complaint by raising an issue for the first time in a brief in opposition to a motion for summary judgment."  SAI v. Transp. Sec. Admin., 315 F. Supp. 3d 218, 234 (D.D.C. 2018) (internal citation omitted).